# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 17, 2023

Lyle W. Cayce
Clerk

No. 22-30311

KENAI IRONCLAD CORPORATION,

*Plaintiff—Appellee,*

*versus*

CP MARINE SERVICES, LLC; TEN MILE EXCHANGE, LLC,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CV-2799

Before HAYNES and ENGELHARDT, *Circuit Judges,* and deGRAVELLES, *District Judge.**

JOHN W. deGRAVELLES, DISTRICT JUDGE:

Kenai Ironclad Corporation ("Kenai" or "Plaintiff") alleged that CP Marine Services, LLC, breached its contract to repair and convert Kenai's offshore supply vessel to a salmon fishing tender for use in Alaska. After Kenai expressed dissatisfaction with the work, the relationship deteriorated.

---

* United States District Judge for the Middle District of Louisiana, sitting by designation.

No. 22-30311

Kenai alleged that, after paying its final invoice, it attempted to remove its vessel from CP Marine's shipyard, but as it did so, CP Marine and co-defendant Ten Mile Exchange, LLC, ("TME") (collectively, "Defendants") rammed, wrongfully seized, detained, and converted Kenai's vessel for five days before finally releasing it.

After a five-day bench trial, the district court found that CP Marine did not breach its contract with Kenai but did wrongfully seize, detain, and convert the vessel. The court awarded punitive damages and attorney's fees for Defendants' bad faith and reckless behavior in ramming, seizing, and converting the vessel for five days.

Defendants appeal, arguing the trial court erred in (1) finding that they wrongfully arrested or detained Kenai's vessel; (2) finding that punitive damages were legally and factually justified; and (3) awarding prejudgment interest on the punitive damages award. After a careful review of the record, we hold that there was sufficient evidence to support the district court's finding that Defendants wrongfully seized, detained, and converted Plaintiff's vessel in a manner that warranted the imposition of attorney's fees and punitive damages. However, because the record is unclear as to certain aspects of the district court's award of punitive damages—namely, whether they were also intended, at least in part, to be compensatory and, if so, in what amount—we REMAND to the district court for clarification of its award.

## FACTS AND PROCEDURAL HISTORY

In December 2018, Plaintiff Kenai orally contracted with Defendant CP Marine to repair, modify, and paint the M/V IRON DON, an offshore supply boat owned by Kenai that it intended to use as a salmon fishing tender in Alaska. Work began in January 2019. In January and February, Kenai's representatives repeatedly expressed concerns about the quality of the work

being performed and requested a written guarantee regarding the work's quality. CP Marine refused to give a guarantee.

Thereafter, CP Marine demanded immediate payment of outstanding invoices, which Kenai paid immediately. Then, Kenai's representatives decided to "end the working relationship with Defendants as soon as possible." CP Marine next demanded that Kenai's crew and equipment be immediately removed from the vessel and shipyard and threatened to charge a $1,000 per day storage fee if Kenai failed to comply. CP Marine further threatened to return the vessel from dry dock to the water and charge a $5,000 per day storage fee.

CP Marine had Jefferson Parish deputy sheriffs evict Kenai's crew from the vessel and then completed its work on same. On February 27, 2019, CP Marine sent Kenai a final invoice. Kenai's Austin Adler

> immediately wrote a check for the final invoice and delivered it to CP Marine, which CP marine deposited the same day. This payment satisfied all outstanding CP Marine invoices to Plaintiff. [ ] Adler called Plaintiff's bank to confirm that the check had cleared . . . [and] a representative from Plaintiff's bank confirmed that Defendant had cashed the check and that it cleared on February 28, 2019.

Six days later, on March 5, 2019, the vessel hired by Kenai to remove the IRON DON from the CP Marine shipyard (the M/V SUPER T) tied onto the IRON DON and began to leave the shipyard. As it was doing so, a vessel owned by TME, the M/V AUNT DI, "rammed" the SUPER T, pinned it and the IRON DON against the bank, and thus prevented Kenai from retrieving its vessel. Joseph Dardar, a part owner of both TME and CP Marine, was at the wheel of the AUNT DI. Moreover, during this event, Dardar threatened Adler.

No. 22-30311

The following day, while the IRON DON was still being detained in the CP Marine shipyard, TME "threatened Plaintiff by sending a $20,750 invoice from TME for ramming and detaining the IRON DON" and demanded payment within two days. At this point, Kenai had "no formal business relationship" with TME, and the invoice was sent "for the sole purpose of intimidating and threatening Plaintiff." Dardar admitted at trial that "he never intended to collect on this invoice and 'should never have sent it.'" "Plaintiff ultimately retrieved the IRON DON and left the CP Marine shipyard on March 11, 2019."

Kenai sued CP Marine and TME for breach of contract, wrongful vessel seizure, conversion, and tortious interference with contractual relations. After a five-day bench trial, the district court held that defendant CP Marine did not breach its oral contract and implied breach of warranty of workmanlike performance in connection with CP Marine's painting, repair, and modifications to the M/V IRON DON. The trial court held in part that "Plaintiff has not met its burden to show that Defendants' allegedly dilatory performance caused [the IRON DON's] late arrival in Alaska."

However, the district court also found that "Defendants acted with bad faith . . . [and] detained the [IRON DON] pursuant to an invalid maritime lien." The court awarded punitive damages measured by "the value of [the vessel's] missed contract days for the days that Defendants wrongfully detained the vessel." Specifically, the court stated it was awarding punitive damages in the amount of $17,580.50, measured by the vessel's daily rate of $3,516.10 times the five days the vessel was wrongfully detained, plus attorney fees, expenses, and court costs.

In addition, the court awarded "pre-judgment interest in accordance with La. R.S. § 9:3500 from March 5, 2019, to the date of judgment, and post-judgment interest in accordance with 28 U.S.C. § 1961(a)." Judgment was

No. 22-30311

entered on May 17, 2022, and Defendants timely appealed on May 25, 2022. Kenai did not.

The matter of the amount of attorney's fees to be awarded was referred to the magistrate judge. Although Kenai submitted attorney's fees totaling $78,017.68, the magistrate judge only recommended payment of $38,831.40, reflecting a downward adjustment due in part to Kenai's loss of its breach of contract claim.[1] On August 9, 2022, the district court adopted the magistrate judge's recommendation. Defendants separately appealed the district judge's adoption of the report and recommendation, but that appeal was dismissed for want of prosecution because Defendants failed to timely file a brief and record excerpts. *Kenai Ironclad Corp. v. CP Marine Servs., L.L.C.*, No. 22-30492, 2022 WL 18776210, at *1 (5th Cir. Dec. 7, 2022). The award of Kenai's attorney's fees is therefore final.

## ISSUES ON APPEAL

Defendants' appeal raises the following issues: did the district court err (1) in finding that Defendants wrongfully seized, detained, and converted Kenai's vessel; (2) in awarding punitive damages; or (3) in awarding prejudgment interest on the punitive damages award?

Resolution of the second issue turns on the proper relationship between punitive damages and compensatory damages, both generally under maritime law and in this case specifically. Sub-issues include: (a) whether the district court erred in awarding punitive damages exceeding the 1:1 punitive damage to compensatory damage ratio set by *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008); (b) whether the district court erred as a matter of law in

---

[1] The magistrate judge's report and recommendation and the district court's order adopting same were not made a part of the ROA. The ROA goes only to E.D. La. ECF No. 113, whereas these orders are E.D. La. ECF Nos. 116, 122.

No. 22-30311

awarding punitive damages in the absence of an explicit award of compensatory damages; and (c) if so, whether the district court's award nevertheless should be affirmed because it had a compensatory component, either because the award of attorney's fees was compensatory or because the punitive damage award itself was in part compensatory.

## DISCUSSION

### I. Did the district court err in finding Defendants wrongfully arrested and converted Kenai's vessel?

"To recover for wrongful arrest of a vessel, there must be (1) no bona fide claim of a maritime lien on the vessel and [(2)] a showing of bad faith, malice, or gross negligence [on the part] of the offending party." *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 574–75 (5th Cir. 2015) (citations and internal quotations omitted). "Whether a maritime lien exists is a question of law, reviewed de novo." *Id.* at 575 (citations omitted). A district court's determination of bad faith, on the other hand, is "a conclusion of fact, which we review under the deferential clear error standard." *Id.* (citation omitted).

"[F]or a bench trial, . . . we will upset the district court's findings of fact only if we are 'left with the definite and firm conviction that a mistake has been committed.'" *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (quoting *Barto v. Shore Constr., LLC*, 801 F.3d 465, 471 (5th Cir. 2015)). "Moreover, and of particular relevance here, the clearly erroneous standard of review following a bench trial requires even 'greater deference to the trial court's findings when they are based on determinations of credibility.'" *Id.* (quoting *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015)). "Accordingly, '[w]e entertain a strong presumption that the court's findings must be sustained even though

No. 22-30311

this court might have weighed the evidence differently.'" *Id.* (quoting *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 303 (5th Cir. 2008)).

The Federal Maritime Lien Act, 46 U.S.C. §§ 31341–31343, grants maritime liens to parties "providing necessaries to a vessel" and allows such parties to bring a civil action in rem to enforce the lien. *Id.* § 31342(a)(1)–(2). "'Necessaries' includes repairs, supplies, towage, and the use of a dry dock or maritime railway . . . ." *Id.* § 31301(4). Prior to Kenai's payment of its final invoice, CP Marine had a valid lien on the IRON DON. *See World Fuel Servs., Inc. v. MAGDALENA GREEN M/V*, 464 F. App'x 339, 341 (5th Cir. 2012) (quoting, *inter alia*, *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) (en banc) (A maritime lien "arises when the debt arises . . . .")).

Because all amounts due had been paid with funds deposited in CP Marine's account six days prior, the district court did not clearly err in finding that no valid lien existed at the time the IRON DON was seized. Once the debt giving rise to the lien was paid, the lien ceased to exist. *World Fuel Servs.*, 464 F. App'x at 341 ("Where, as here, the debt is repaid and satisfaction is acknowledged, the lien ceases to exist." (citing *Mullane v. Chambers*, 438 F.3d 132, 138 (1st Cir. 2006))). *See also Argos Ports (Hous.) LLC v. Kirby Inland Marine, LP*, 598 F. Supp. 3d 512, 519 (S.D. Tex. 2022) ("[A]ny claim T&T might have had would have been extinguished by payment.").[2]

Defendants argue that they seized the vessel because (a) Kenai's check had not cleared and (b) Dardar was concerned that Plaintiff might

---

[2] *See also Bunkers Int'l Corp. v. M/V Wuchow*, No. 15-5221, 2016 WL 1161288, at *3 n.1 (E.D. La. Mar. 23, 2016) ("BIC's purported maritime lien would be extinguished if BIC received payment from China Navigation pursuant to its invoice."); *Maritrend, Inc. v. M/V SEBES*, No. 96–3140, 1997 WL 660614, at *2 (E.D. La. Oct. 23, 1997) ("the contractor acquires a maritime lien against the vessel until payment is satisfied").

No. 22-30311

cancel the check and remove the funds from CP Marine's account. The district court rejected this explanation because (a) Defendants had "produced no evidence that these check payments did not clear or were cancelled;" (b) Dardar's testimony lacked credibility; (c) the check had cleared on February 28, 2019; and (d) the funds had been in CP Marine's account for six days at the time the IRON DON was seized. On this record, ample evidence supports the district court's conclusion that well before the seizure, CP Marine's bill was paid in full, so there was no longer a valid lien.

Defendants also argue that the IRON DON was never arrested and thus could not have been arrested wrongfully. Contrary to the district court's finding that the AUNT DI "rammed" the SUPER T and endangered lives, "the evidence overwhelmingly shows that the bumping was controlled, safe and appropriate under the circumstances." According to Defendants, the bumping of the SUPER T was "initiated for a proper purpose," *i.e.*, "to create a pause in the unfolding events so they could be rationally discussed . . . ." Furthermore, there is no evidence that Defendants ever refused a request to return the IRON DON, and once the request was made on March 10, it was returned the next day.

Next, Defendants contend that Kenai did not prove that any arrest or detention was in bad faith: "the 'gravamen of the right to recover damages for wrongful [arrest] or detention of vessels.'" Defendants were "fully justified in the name of safety in stopping Kenai's effort to unilaterally remove the vessel from the shipyard . . . ." According to Defendants, the manner in which the SUPER T was removing the IRON DON was unsafe in that (a) it was being moved through a narrow channel, which imperiled CP Marine's hopper barge and dry dock, and (b) the removal attempt was reckless in that the attempt was being made with only a single vessel.

No. 22-30311

Contrary to Defendants' argument, the record contains ample evidence that the IRON DON was wrongfully arrested and, indeed, rammed and pinned against the bank. This evidence includes the testimony of Jonathan Tingley, video evidence of the ramming, the testimony of Austin Adler, and even that of Joseph Dardar.[3] Defendants' bad faith detention and conversion of the vessel is also supported by Defendants' intentional blocking of the canal for five days following the ramming.

Kenai presented sufficient evidence and testimony to support the trial court's finding that Defendants acted "in bad faith and with wanton disregard of the legal rights of Plaintiff." This evidence includes the backdrop against which the seizure occurred: the deterioration of the parties' relationship following Plaintiff's request for a written guarantee on the quality of the work and Defendants' refusal to provide same. It also includes (a) Defendants' demand that Plaintiff remove its personnel from the vessel and equipment from the shipyard although their presence had been a part of the original agreement; (b) Defendants' threat to charge Plaintiff a storage fee of $1,000 per day if the equipment wasn't removed; (c) Defendants' threat to move the IRON DON from the dry dock to the water and thereafter charge $5,000 per day until it was removed because "[Dardar] wanted them off [his] property . . . to motivate them to get off [his] property"; (d) the AUNT DI's ramming of the SUPER T and the IRON DON, which the trial court found to be in "callous disregard for the safety of the people aboard the

---

[3] Although Defendants portray the contact as "the bumping of one tug into the other," Dardar admitted that he "laid up against him hard, and [Dardar] had a hold against him." Tingley described it as "extreme acceleration." After viewing the video, the district judge said, "[W]hat I'm seeing here is very troubling. The behavior here is very troubling." The court also stated, "[H]ow somebody goes to that extreme and puts life at stake because they think somebody owes them money is a very hard hurdle for me to overcome in my fact finding." We conclude that there was no clear error in the district court's assessment.

No. 22-30311

vessels"; (e) Joseph Dardar's threat made during the course of the vessel's arrest that "[i]f I had my shotgun, you'd be dead"; (f) Defendants blocking the canal for five days following the seizure; (g) the district court's disbelief of Dardar's purported reason for holding the vessel (waiting for the check to clear); and (h) TME's billing Plaintiff for TME's wrongful seizure of the IRON DON on March 5, which the court found was "for the sole purpose of intimidating and threatening Plaintiff" and which Dardar later admitted was "inappropriate" and should never have been sent.

In conclusion, the district court did not clearly err in finding that Kenai's vessel was wrongfully seized and converted in bad faith and in reckless disregard of Kenai's rights.

## II. Did the district court err in awarding punitive damages?

### A. Did the facts support such an award?

General maritime law has long recognized the availability of punitive damages in the appropriate case. *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 414–15 (2009). As the Court in *Townsend* stated, "[P]unitive damages have long been available at common law[,] [and] . . . the common-law tradition of punitive damages extends to maritime claims." *Id.* at 414. *See also Exxon*, 554 U.S. 471.[4] "Punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct," *Townsend*, 557 U.S. at 409, but have also been awarded when a defendant engaged in "reckless action,"

---

[4] "[*Exxon*] and *Townsend* affirm that, as a general rule, punitive damages are available in appropriate cases under the general maritime law. Thus, punitive damage awards are generally proper in cases in admiralty jurisdiction." 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5:10 (6th ed. 2022).

No. 22-30311

that was "worse than negligent but less than malicious," *Exxon*, 554 U.S. at 510–11.[5]

As summarized in the preceding section, Kenai presented sufficient evidence and testimony to support the district court's finding that Defendants' conduct was in bad faith, in callous disregard for the safety of the people aboard the vessels, and in reckless disregard of Kenai's rights. Hence, the district court did not clearly err in finding facts sufficient to support an award of punitive damages.

---

[5] The Court in *Townsend* noted that maritime punitive damages are available in a wide variety of circumstances as exemplified in maritime law's earliest cases, citing, for example, *Boston Manufacturing Co. v. Fiske*, 3 F. Cas. 957, 957 (Story, Circuit Justice, C.C. Mass. 1820) (No. 1,681) ("In cases of marine torts, or illegal captures, it is far from being uncommon in the admiralty to allow costs and expences, and to mulct the offending parties, even in exemplary damages, where the nature of the case requires it[.]"). *Townsend*, 557 U.S. at 411–12.

> In short, prior to enactment of the Jones Act in 1920, "maritime jurisprudence was replete with judicial statements approving punitive damages, especially on behalf of passengers and seamen." Robertson, Punitive Damages in American Maritime Law, 28 J. Mar. L. & Comm. 73, 115 (1997) (hereinafter Robertson); see also 2 Sedgwick § 599b, at 1156 ("Exemplary damages are awarded in Admiralty, as in other jurisdictions"); 2 J. Sutherland, Law of Damages § 392, p. 1272 (4th ed. 1916) ("As a rule a court of equity will not award [punitive] damages, but courts of admiralty will . . ." (footnote omitted)).

*Id.* at 412.

*Townsend* cited with approval Professor Robertson's article which discussed the general availability of punitive damages in admiralty. *Id.* Professor Robertson's article surveyed a variety of early maritime cases recognizing such awards. 28 J. Mar. L. & Com. at 88–115. Two such cases involved conversion, *id.* at 114–15, and one dealt with a steamboat that "deliberately rammed its rival, causing relatively slight property damage and no personal injuries," *id.* at 90.

No. 22-30311

### B. *Was there legal error?*

#### 1. *Is <u>Exxon v. Baker</u>'s ratio absolute?*

"A district court's damages award is a finding of fact, which this court reviews for clear error." *Comar Marine*, 792 F.3d at 574 (quoting *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006) (per curiam)). But, "[d]espite this court's typical deference to a district court's factual findings, 'a judgment based on a factual finding derived from an incorrect understanding of substantive law must be reversed.'" *Barto*, 801 F.3d at 471 (quoting *Mobil Expl. and Producing U.S., Inc. v. Cajun Const. Servs., Inc.*, 45 F.3d 96, 99 (5th Cir. 1995)). Thus, this court reviews *de novo* the legal questions of whether *Exxon*'s 1:1 ratio applies in all maritime cases, and whether that ratio should have been applied by the district court, regardless of its specific factual findings as to Defendants' level of culpability and the amount of harm done to Kenai.

According to Defendants, *Exxon* held that "a 1:1 [punitive damage to compensatory damage] ratio . . . is a fair upper limit in such maritime cases." 554 U.S. at 513. Thus, Defendants argue, since no compensatory damages were awarded here, *any* punitive damage award impermissibly exceeds the ratio.

Plaintiff offers three reasons why Defendants' position is wrong. First, *Exxon*'s 1:1 ratio does not apply in this case because it only applies in cases involving gross negligence and only where the compensatory damages are significant. Here, Defendants' conduct was intentional and malicious, and the district court "limited [compensatory damages] to attorney's fees." Second, Plaintiff maintains that if *Exxon* does require compensatory damages as a prerequisite to an award of punitive damages, the attorney's fees awarded by the district court were compensatory. Finally, even if attorney's fees cannot be considered compensatory, the district court's punitive

No. 22-30311

damage award recognized and was measured by the harm that Plaintiff suffered from Defendants' five-day seizure and detention of its vessel. Thus, the punitive damage award "was, in fact, compensatory – or at the very least, it had . . . a compensatory flavor[.]"

Regarding Plaintiff's first argument, this court has not had occasion to consider whether *Exxon*'s 1:1 ratio applies in all cases or only in cases "like" *Exxon,* involving "reckless action, profitless to the tortfeasor, resulting in substantial recovery for substantial injury[,]" and where the conduct was "worse than negligent but less than malicious." *Exxon*, 554 U.S. at 510–11. Nor, to our knowledge, have the other federal courts of appeal or district courts. Some state courts, however, have.

The majority of the cases that have squarely considered whether *Exxon* sets a hard rule applicable to all cases hold that it does not. *See, e.g.*, *Clausen v. Icicle Seafoods, Inc.*, 272 P.3d 827, 835 (Wash. 2012), *cert. denied*, 568 U.S. 823 (2012) ("The *Exxon* case cannot be read as establishing a broad, general rule limiting punitive damage awards, primarily because nowhere in the opinion can such a rule be found."); *McWilliams v. Exxon Mobil Corp.,* 2012-1288 (La. App. 3 Cir. 4/3/13), 111 So. 3d 564, 579, *writ denied*, 2013-1402 (La. 11/8/13), 125 So. 3d 451 (*Exxon* "did not establish a general rule pertaining to punitive damages, but rather, narrowly tailored that result to the unique case before it."); *Colombo v. BRP US Inc.*, 179 Cal. Rptr. 3d 580, 606 (Cal. Ct. App. 2014) ("[W]e conclude that the [C]ourt [in *Exxon*] did not intend to create . . . a bright-line rule limiting punitive damages to the amount of compensatory damages awarded to a plaintiff."); *Warren v. Shelter Mut. Ins. Co.*, 2016-1647 (La. 10/18/17), 233 So. 3d 568, 590 ("[W]e find the Court in *Exxon* was expressly attempting to set a 'fair upper limit' for punitive damages 'in cases with no earmarks of exceptional blameworthiness . . . .'" (quoting *Exxon*, 554 U.S. at 513)). In a Winter 2021 article surveying the

No. 22-30311

jurisprudence on this issue, Professor Thomas C. Galligan, Jr. summarized the case law as follows:

> To recap, virtually all of the courts that have meaningfully discussed the impact of *Exxon*'s statement concerning the 1:1 ratio of punitive to compensatory damages have refused to treat it as a per se rule applicable in all admiralty cases. Rather than emphasizing the broad scope of Justice Souter's review of the relevant social science data on punitive damages, the lower courts have emphasized the limiting language in Justice Souter's opinion. That is, the lower courts have treated the 1:1 ratio as the precise holding of the *Exxon* case, a holding applicable to the facts before the Court. At most, the courts have treated *Exxon* as a rule for cases "like" *Exxon*. Those are cases where the defendant's conduct constituted recklessness or gross negligence and not worse, such as willful, wanton, malicious, arbitrary, capricious, or intentional wrongdoing. Additionally, *Exxon* was a case in which the damage was not difficult to detect—it was substantial and overt. It was also a case where the compensatory damages, fines and penalties, cleanup costs, and settlements of claims were substantial, even gargantuan. Moreover, *Exxon* was a case in which the defendant's behavior—not taking action to relieve a known, relapsed alcoholic of command of an oil tanker—was not motivated by profit.

Thomas C. Galligan, Jr., *There Are More Things to Punitive Damages in Admiralty Than the 1:1 Ratio Set Forth in Exxon's Legal Philosophy*, 81 La. L. Rev. 395, 420–21 (2021).[6]

---

[6] Galligan's article argues that the appropriate reading of *Exxon* is that it created a variable, multi-factor approach to punitive damages in maritime cases, rather than a universal 1:1 rule. The variable approach is supported by a careful reading of *Exxon* itself,

No. 22-30311

Schoenbaum's treatise, on the other hand, states without elaboration that *Exxon* "ruled that 'a punitive to compensatory ratio of 1:1 . . . yields maximum punitive damages[ ]'" and that "[t]his ratio, the Court held, constitutes a 'fair upper limit' for maritime punitive damage awards." Schoenbaum, *supra*, at § 5:10. Schoenbaum cites for this proposition *Norfolk & Portsmouth Belt Line Railroad Co. v. M/V MARLIN*, No. 08-134, 2009 WL 1974298, at *4 (E.D. Va. Apr. 3, 2009), and *Priyanto v. M/S Amsterdam*, No. 07-3811, 2009 WL 1202888 (C.D. Cal. Apr. 30, 2009). But neither cited case dealt directly with the issue here: whether *Exxon*'s 1:1 ratio applies in all cases.[7]

Notably, Professor Galligan discusses *Norfolk & Portsmouth* at length. 81 La. L. Rev. at 407–09. He concludes that *Norfolk & Portsmouth* "essentially stands alone." *Id.* at 409.

---

the desirability of flexibility in imposing punitive damages for purposes of adequate punishment and efficient deterrence, and the jurisprudence since Exxon.

81 La. L. Rev. at 395. *See also* Erin L. Brooks, *A Rule Old and New, Borrowed and Blue: Exxon Adapts State Punitive Liability Law to Craft New Interpretation in Admiralty*, 54 St. Louis U. L.J. 357, 380 (2009) ("Under *Exxon*, punitive damages must only be limited in precise proportion to actual damages when the conduct is not exceptionally blameworthy (intentional, malicious, or driven for gain) or when it is without 'modest economic harm or [low] odds of detection.'") (citing *Exxon*, 554 U.S. at 513).

[7] For example, in *Norfolk & Portsmouth*, a maritime allision case, the court denied plaintiff's motion to amend its complaint to add a claim for damages pursuant to a Virginia punitive damage statute that provided for a "strict and inflexible [3:1] ratio of punitive damages to actual or compensatory damages . . . [which] automatically applied . . . ." 2009 WL 1974298, at *4. The court denied plaintiff's motion to amend because Virginia's "automatic punitive damage remedy in the form of triple damages is inconsistent with *Exxon*'s 1:1 ratio . . . and therefore conflicts with the general maritime law." *Id.* But while *Norfolk & Portsmouth* did not confront the precise issue of whether *Exxon* created a hard cap on all maritime punitive damage awards, it suggested in dicta that it did not. *See id.* at *3 (characterizing *Exxon*'s holding as, "*except for the most extreme cases*, the maximum permissible ratio is likely 1:1." (emphasis added) (citing *Exxon*, 554 U.S. at 514–15)).

No. 22-30311

We hold that the majority position is the correct reading of *Exxon* for the following reasons. First, the language of *Exxon* itself strongly suggests that the 1:1 ratio applies, to use the words of the Court, in "cases like [that] one," 554 U.S. at 513, which was described as "a case of reckless action, profitless to the tortfeasor, resulting in substantial recovery for substantial injury[,]" *id.* at 510–11. The court further defined Exxon's conduct as "worse than negligent but less than malicious." *Id.* at 510.

Second, there is nothing in the Supreme Court's subsequent maritime punitive damage cases suggesting that 1:1 is a hard and inflexible rule. In *Townsend*, decided a year later, the Court considered this an open question. *See Townsend*, 557 U.S. at 424 n.11 ("Nor have petitioners argued that the size of punitive damages awards in maintenance and cure cases necessitates a recovery cap, which the Court has elsewhere imposed. We do not decide these issues." (internally citing *Exxon*, 554 U.S. at 514–15)).

Third, where the conduct is intentional and malicious, and the compensatory damages are small, imposing the 1:1 ratio would do little to serve the twin purposes of punitive damages: to punish the wrongdoer and deter his and others' similar future conduct. *Exxon*, 554 U.S. at 492 ("[T]he consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct.").

Defendants' conduct here, unlike that in *Exxon*, was intentional: the ramming of the SUPER T and its tow, the IRON DON. It was not done for purposes of safety but in anger. (*See, e.g.*, Dardar's threat that "[i]f I had my shotgun, you'd be dead."). The district court found that Defendants' conduct displayed "callous disregard for the safety of the people aboard the vessels" and was "in bad faith and with wanton disregard of the legal rights of Plaintiff." As reviewed above, there is no clear error in this finding. Furthermore, unlike *Exxon,* where the compensatory damages were massive,

No. 22-30311

the harm suffered by the five-day delay in the return of Kenai's vessel was relatively small.[8]

### 2. *Do punitive damages require compensatory damages?*

We need not resolve this issue now. As explained below, it is unclear whether the district court intended her award to be compensatory, at least in part. Because we remand to the district court for clarification on that issue, we pass on this thornier question.

### 3. *Was this attorney's fee award compensatory?*

Kenai contends that, even if a compensatory damage award is necessary in order to obtain punitive damages, the attorney's fees were awarded as compensatory damages. Defendants cite *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200 (1988) for the proposition that "[a]s a general matter . . . a claim for attorney's fees is not part of the merits of the action to which the fees pertain." Therefore, contend Defendants, the attorney's fees awarded by the district court were awarded as costs and not damages and cannot form a foundation for the award of punitive damages. Defendants maintain that *The Apollon*, 22 U.S. 362 (1824), relied on by Kenai, is inapposite in that here, unlike in *Apollon*, there was no proof of attorney's fees offered at trial.

While there is some basis for Kenai's position as a general proposition, it ultimately falls short under the law governing wrongful arrest and the facts

---

[8] Awards of punitive damages are, of course, constrained by "[t]he Due Process Clause of the Fourteenth Amendment [which] prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). *See also TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 446 (1993); *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 884–85 (5th Cir. 2013), *cert denied sub nom.*, *Accenture, L.L.P. v. Wellogix, Inc.*, 573 U.S. 904 (2014); *Lincoln v. Case*, 340 F.3d 283, 292 (5th Cir. 2003).

No. 22-30311

of this case. We have stated the following about the award of attorney's fees as damages in wrongful seizure cases:

> The reasons for the award of [such] damages are analogous to those in cases of malicious prosecution. The defendant is required to respond in damages for causing to be done through the process of the court that which would have been wrongful for him to do himself, having no legal justification therefor and acting in bad faith, with malice, or through a wanton disregard of the legal rights of his adversary.

*Frontera Fruit Co. v. Dowling*, 91 F.2d 293, 297 (5th Cir. 1937).

Thus, by way of analogy, for common law malicious prosecution actions, "[c]ompensatory damages for tangible losses or harm normally include reasonable attorney fees and other expenses incurred in defending the wrongful criminal or civil litigation or avoiding or quashing abusive process . . . ." Dobbs, Hayden, & Bublick, *supra*, at § 596; *cf. also Hale v. Fish*, 899 F.2d 390, 403–04 (5th Cir. 1990) (reinstating § 1983 plaintiff's award of $25,000 "for the amount expended in his defense of the criminal charges against him").

Such awards are more properly categorized as compensatory damages only when they were incurred as "collateral legal expenses"—defined as attorneys' fee outlays incurred in some way *other* than the proceeding in which the attorneys' fee award is being sought . . . ." David W. Robertson, *Court-Awarded Attorneys' Fees in Maritime Cases: The "American Rule" in Admiralty*, 27 J. Mar. L. & Com. 507, 511 (1996) (emphasis added). However, many courts make such awards without drawing this distinction. *See id.* at 539 (citing, *inter alia*, *State Bank & Tr. Co. of Golden Meadow v. Boat D.J. Griffin*, 755 F. Supp. 1389 (E.D. La. 1991)).

Here, since the attorney's fees awarded were in connection with services rendered in this case, there was no other proceeding in which

No. 22-30311

attorney's fees were incurred and thus, no "collateral legal expenses." The magistrate judge's recommendation limited the attorney's fees in large measure to that part of the case dealing with the wrongful seizure (excluding the fees incurred in connection with the unsuccessful breach of contract claim). Still, the fees awarded were earned in this, not a collateral, proceeding and, therefore, may not properly be considered compensatory damages.[9]

### 4. Was the punitive damage award partly compensatory?

In connection with its argument on prejudgment interest, Kenai argues that the language and reasoning of the district court's award of punitive damages shows that the award was intended to be compensatory, at least in part. Defendants maintain the award was "entirely punitive" because "the district court found that Kenai suffered no damage from delay at CP Marine's shipyard."

In this case, the district court's ruling strongly suggests that the punitive damages award was intended, at least in part, to compensate Kenai for the five-day loss of its vessel:

> Although the Court finds that Defendants' performance was not dilatory and did not cause Plaintiff's late arrival in Alaska, *Defendants' wrongful detention of Plaintiff's vessel plainly delayed Plaintiff by five days*. Therefore, as a measure of punitive damages, the Court will award Plaintiff *the value of its missed contract days* for the days that Defendants wrongfully detained the vessel.

Here, the district court found that Defendants converted Plaintiff's vessel for five days. The district court's discussion of Defendants' bad faith

---

[9] We again note that Defendants' separate appeal of the attorney's fees award was dismissed for want of prosecution. *Kenai Ironclad*, 2022 WL 18776210, at *1. Thus, this award is final.

conduct in the court's Conclusions of Law is entitled "Wrongful Arrest and Conversion."

"Under the general maritime law, as under the common law of torts, a person may be liable for certain intentional wrongs, such as conversion[.]" Schoenbaum, *supra*, at § 5:3 (citing *The Lydia* (*Hugh D. MacKenzie Co. v. Steamship Lydia*), 1 F.2d 18 (2d Cir. 1924)). The Fifth Circuit looked to the "landside context" for this maritime tort to define it as "the unlawful and wrongful exercise of dominion, ownership or control over the property of another, to the exclusion of the same rights by the owner." *Goodpasture, Inc. v. M/V Pollux*, 602 F.2d 84, 87 (5th Cir. 1979) (citing *Bankers Life Ins. Co. v. Scurlock Oil Co.*, 447 F.2d 997, 1004 (5th Cir. 1971) (applying Texas law)). *See also 4 H Const. Corp. v. Superior Boat Works, Inc.*, 659 F. Supp. 2d 774, 780 (N.D. Miss. 2009), *aff'd*, 579 F. App'x 278 (5th Cir. 2014) (finding Mississippi state law of conversion relevant because its application "would not interfere with the uniformity or characteristic features of admiralty and maritime law[]"); Restatement (Second) of Torts § 222A (Am. L. Inst. 1965) (defining "conversion" as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.").

Some courts have found that maritime law requires a finding of bad faith to establish conversion, at least in the context of wrongful attachment. *See Furness Withy (Chartering), Inc., Panama v. World Energy Sys. Assocs., Inc.*, 854 F.2d 410, 412 & n.6 (11th Cir. 1988). *See also Comar Marine*, 792 F.3d at 575 n.32 (citing *Furness* with approval in describing burden of proving wrongful seizure and stating that it requires showing of bad faith). *See also* Restatement (Second) of Torts § 222A (identifying good faith as one of six "important" factors "[i]n determining the seriousness of the interference and the justice of requiring the actor to pay the full value"). Ultimately, the

No. 22-30311

exact contours of the maritime tort of conversion need not be defined here, as the district court correctly found that Defendants wrongfully exercised control over Kenai's vessel to Kenai's exclusion and that Defendants did so in bad faith.[10]

Defendants argue that despite the district court's finding that Defendants converted Kenai's vessel resulting in its loss of use for five days and despite the court's use of the vessel's daily rate as the measure of punitive damages, the court's award was in no way compensatory. While the district court's reference to the tort of conversion tends to support Kenai's position that the award is in part compensatory, there is some ambiguity in the trial court's decision. As a result, we remand for clarification. If the award was intended to be compensatory in part, the court should make clear its delineation of compensatory and punitive damages.

### III.　Did the district court err in awarding pre-judgment interest?

Defendants urge that the district court erred in awarding prejudgment interest, as it is not allowed under Louisiana law or federal law.[11] Kenai responds that, while "prejudgment interest is not [generally] applicable to punitive damages awards under maritime cases[,]" the award here is actually

---

[10] The district court called this an act of conversion, but there is some authority that this is perhaps more accurately called trespass to chattel. *See* Restatement (Second) of Torts § 222A cmt. c (distinguishing between two torts and explaining that conversion entitled plaintiff to "full value of the chattel" while trespass to chattel allows a plaintiff to "recover for the diminished value of his chattel because of any damage to it, *or for the damage to his interest in its possession or use*" (emphasis added)). Again, the exact contours of the tort need not be fully explored, as, either way, Kenai is entitled to compensation for the loss of use of its property.

[11] Defendants also argue that the district court's judgment did not grant prejudgment interest on the award of attorney's fees, but, to the extent that it did so, this was inappropriate. This is not before the court since the attorney's fee award was appealed separately and dismissed for want of prosecution.

No. 22-30311

compensatory in nature, at least enough so to justify an award of prejudgment interest. Kenai points the panel to *Illinois Central Railroad Co. v. Texas Eastern Transmission Corp.*, 551 F.2d 943 (5th Cir. 1977), where the court affirmed pretrial interest on demurrage although the demurrage award was partly punitive in nature.

Defendants dispute Kenai's allegation that the punitive damages award was partly compensatory because "the district court found that Kenai suffered no damage from delay at CP Marine's shipyard." This, argue Defendants, is a critical fact that distinguishes *Illinois Central.*

> "As a general rule, prejudgment interest should be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled." The district court has discretion to deny prejudgment interest "only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest."

*Comar Marine*, 792 F.3d at 580 (quoting *Noritake*, 627 F.2d at 728–29). *See also In re Signal Int'l, LLC*, 579 F.3d 478, 500 (5th Cir. 2009) (citing *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 204 (5th Cir.1995)).

As discussed earlier, we are unable to resolve this issue because it is unclear whether the district court intended the punitive damages award to be in part compensatory. If, as in *Illinois Central*, it was intended to be partly compensatory, the district court's grant of prejudgment interest was appropriate. The case is remanded to the district court for clarification of this issue.

No. 22-30311

## CONCLUSION

In sum: we AFFIRM the district court's finding that Defendants wrongfully seized and converted Kenai's vessel in bad faith and in a manner egregious enough to warrant an award of punitive damages. We VACATE the district court's award of damages and REMAND on the limited basis of clarifying the court's award, specifying whether any part of the award was intended as compensatory damages and, if so, in what amount. In doing so, the district court should make whatever findings of fact and conclusions of law are necessary to arrive at its decision. Additional briefing of the parties is strongly encouraged. Whatever the decision of the district court, it will not be necessary for the parties to file a new notice of appeal in order to obtain appellate review of that decision. The parties need only file certified copies of the district court's ruling plus any supplementary briefs and materials. The matter will then be referred to this panel. *See United States v. Gaston*, 608 F.2d 607, 614 n.3 (5th Cir. 1979); *Chaney v. Schweiker*, 659 F.2d 676, 679 n.5 (5th Cir. 1981); *Royal Bank of Canada v. Trentham Corp.*, 665 F.2d 515, 519 (5th Cir. 1981).